# EXHIBIT A

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Case Type: Employment

---

Rolanda Schmidt,

    Plaintiff,

vs.

University of Northwestern-St. Paul, Philip
Vierling, (individually and as a representative
of University of Northwestern-St. Paul), David
Erickson (individually and as a representative of
University of Northwestern-St. Paul), Tanya
Grosz (individually and as a representative of
University of Northwestern-St. Paul) and Sue
Johnson (individually and as a representative of
University of Northwestern-St. Paul),

    Defendants.

Court File No.:
Honorable _____

**SUMMONS**

---

THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANTS.

1.    **YOU ARE BEING SUED.** Rolanda Schmidt has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2.    **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at 4057 Brunswick Avenue, St. Louis Park, MN 55416.

3.    **YOU MUST RESPOND TO EACH CLAIM**. The Answer is your written response to Stephanie Core's Complaint. In your Answer, you must state whether you agree or disagree with each paragraph of Rolanda Schmidt's Complaint. If you believe that Rolanda Schmidt should not be given everything asked for in the Complaint, you must say so in your Answer.

4.    **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award Rolanda Schmidt everything asked for in the Complaint. If

you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

5.    **LEGAL ASSISTANCE**.  You may wish to get help from a lawyer.  If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6.    **ALTERNATIVE DISPUTE RESOLUTION**.  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.


Dated:   June 21, 2023                             **WARD LAW GROUP**

                                                   By:   *Damon L Ward*
                                                         Damon L. Ward, ID # 221442
                                                   4057 Brunswick Avenue
                                                   St. Louis Park, MN 55416
                                                   (612) 353-1000 Office
                                                   (612) 282-3060 Direct
                                                   (866) 759-6030 Fax

                                                   **ATTORNEYS FOR PLAINTIFF
                                                   ROLANDA SCHMIDT**

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Case Type: Employment

---

Rolanda Schmidt,

    Plaintiff,

vs.

University of Northwestern-St. Paul, Philip
Vierling, (individually and as a representative of
University of Northwestern-St. Paul), David
Erickson (individually and as a representative of
University of Northwestern-St. Paul), Tanya Grosz
(individually and as a representative of University
of Northwestern-St. Paul) and Sue Johnson
(individually and as a representative of University
of Northwestern-St. Paul),

    Defendants.

Court File No.:
Honorable _____

**VERIFIED COMPLAINT
AND JURY DEMAND**

---

    Plaintiff Rolanda Schmidt (hereinafter "Ms. Schmidt," "Dr. Schmidt," "Professor Schmidt" or Plaintiff) for her Verified Complaint against University of Northwestern-St. Paul states and alleges the following:

## **PARTIES**

    1.    Plaintiff Rolanda Schmidt is a natural citizen and resident of the State of Minnesota. Ms. Schmidt is an African American woman, and resided in the City of Lino Lakes, County of Anoka, State of Minnesota. At all times relevant herein, Plaintiff was employed by Defendant University of Northwestern-St. Paul.

    2.    Defendant University of Northwestern-St. Paul ("UNW") is a nonprofit corporation located in Roseville, Minnesota, and is organized and existing under the laws of the State of Minnesota.

3.     Defendant Philip Vierling is a natural citizen and resident of the State of Minnesota. Mr. Vierling is a white man, and resides in the State of Minnesota. At all times relevant herein, Defendant Vierling was employed by Defendant University of Northwestern-St. Paul, and acted in his individual capacity as well as in his capacity as a representative of UNW.

4.     Defendant David Erickson is a natural citizen and resident of the State of Minnesota. Mr. Erickson is a white man, and resides in the State of Minnesota. At all times relevant herein, Defendant Erickson was employed by Defendant University of Northwestern-St. Paul, and acted in his individual capacity as well as in his capacity as a representative of UNW.

5.     Defendant Tanya Grosz is a natural citizen and resident of the State of Minnesota. Ms. Grosz is a white woman, and resides in the State of Minnesota. At all times relevant herein, Defendant Grosz was employed by Defendant University of Northwestern-St. Paul, and acted in his individual capacity as well as in her capacity as a representative of UNW.

6.     Defendant Sue Johnson is a natural citizen and resident of the State of Minnesota. Ms. Johnson is a white woman, and resides in the State of Minnesota. At all times relevant herein, Defendant Johnson was employed by Defendant University of Northwestern-St. Paul, and acted in her individual capacity as well as in his capacity as a representative of UNW.

## VENUE AND JURISDICTION

7.     This court has concurrent jurisdiction over Title 28 U.S.C. Sections 1343 (Civil Rights) and 1331 (Federal Question Jurisdiction) because Plaintiff bases her claims in part on 42 U.S.C. Section 2000e-2 (Title VII); 42 U.S.C. Section 1981; 42 U.S.C. Section 1983;  29 U.S.C. Section 623, Age Discrimination in Employment Act ("ADEA"), as well as 42 U.S.C. Sections 12112(a).

8.     Venue is proper in this Court because Defendant resides in or has a principal place

of business in this district, and because this action arises from transactions, events, or occurrences within this district as contemplated by Minn. Stat. §542.02.

## FACTUAL ALLEGATIONS

### Defendants' Background:  Legacy of Discrimination and Inequity

9.      University of Northwestern-St. Paul has a known, documented and public history of inequity, discrimination, and retaliation against staff who are people of color, LGBTQ+ and UNW has a history of tolerating and turning a blind eye to its systemic problems.

10.     UNW HAS claimed to recognize the challenges faced by the university, always promising to address and remedy the situation. However, as public records and protests demonstrate, so-called efforts to address equity for the university community and staff have fallen woefully short; with implicit bias, microaggressions and outright discriminatory conduct and racial harassment leading to claims of discrimination, legal action against and settlements by Defendant UNW.

11.     Plaintiff experienced first-hand the legacy of discrimination, intimidation, retaliation by UNW, as well as an on-campus hate-crime, and other incidents, during her employment at University of Northwestern-St. Paul, giving rise to this lawsuit.

12.     After a rigorous interview process including background checks, reviews, interviews and classroom observations, Dr. Schmidt accepted an offer of employment from University of Northwester-St. Paul on or about July 28, 2017.

13.     Until she received notification of her termination in June 2018 from UNW, Plaintiff Schmidt was Assistant Professor of Business, Business Program Manager, CGOAL at UNW.

14.     Dr. Schmidt had a quasi-successful start with UNW (although having to endure improper questioning even in the review process) until that was summarily and abruptly ended by

3

Defendant's administrators and staff who engaged in a year-long pattern of harassment, defamation, discrimination, and retaliatory conduct against Ms. Schmidt. These issues and concerns were discussed with H.R., as well as with Defendant. The conduct continued unabated, ending with Dr. Schmidt's discharge by Defendant UNW.

15.     UNW has a low percentage of students of color. The university's teaching staff and management is overwhelmingly White. Despite the noble promises of UNW's leadership, discrimination has not been seriously addressed at UNW. Anecdotal accounts demonstrate that UNW continues to discriminate against staff and students of color.

16.     At all relevant times, the conduct of Defendants described throughout this Verified Complaint was based on the Plaintiff's race, gender, and age. After experiencing repeated discriminatory and retaliatory conduct by Defendant, as well as a hate crime, Plaintiff began experiencing medical, emotional, and mental health problems as a result of the stress and turmoil caused by Defendant's conduct.

17.     Thereafter, Plaintiff sought FMLA leave which Defendant summarily denied; adding to their other discriminatory and retaliatory behavior.

18.     After a pretended "independent" so-called investigation—conducted by Defendant's then legal counsel on the matter (and participant in the discrimination) masquerading under the Minnesota registered assumed name "trainED"—Defendant terminated Plaintiff's employment.

### Background – Rolanda Schmidt

19.     Ms. Schmidt is a highly qualified and experienced professional who has established herself as an entrepreneur, national best-selling author, scholar, key-note speaker, and community servant.

20.    Dr. Schmidt was the CEO and founder of a tax accounting firm for nearly 17 years, working in leadership roles within the corporate, non-profit, and public sectors. With this gamut of skills, Dr. Rolanda transitioned part-time (and later full-time) into academia, as a business professor for 12 years. During which time, Dr. Schmidt was also the first African American female endorsed candidate for MN State Representative in District 52A. Dr. Schmidt is currently the CEO of Truth with Grace Consulting specializing in management consulting for individuals, religious and academic institutions, corporations, and non-profit organizations. She has helped hundreds of companies, individuals, and organizations transform broken infrastructures to success.

21.    Dr. Schmidt is also a Certified Professional Project Manager (University of St. Thomas), having earned a Bachelor of Science in Management and Master of Science in Management from Cardinal Stritch University, an MPhil in Public Policy and Administration from Walden University, and has a Ph.D. with a concentration in International Finance.

22.    Prior to employment with UNW, Plaintiff's employment in academia was consistently uneventful, without significant incident and without reproach.

## Sustained Course of Harassment, Discrimination, and Retaliation Against Ms. Schmidt Leading up to June 2018 Termination

23.    During the interview and observation process for hiring at UNW, no one expressed any concerns or disappointment in Plaintiff's teaching skills or methodologies. In fact, just the opposite.

24.    Defendant's employee Dr. Dave Erickson, former Interim President of UNW and then current UNW professor, observed Dr. Schmidt's classroom instruction and queried whether Dr. Schmidt was interested in a leadership role.

25.    When Dr. Schmidt stated she was interested, Dr. Erickson suggested she also

consider the Program Manager position part-time as well which clearly was attributed to her teaching skill, background and presentation/observation.

26.     Having succeeded at that phase of the hiring process, Dr. Schmidt was invited to a meeting of the full teaching staff.

27.     During that subsequent interview session with the full staff, Defendant employee Dr. James Smith questioned Ms. Schmidt's ability to fit into "their" culture since "all of [their (white teachers)] lives were smooth" and her life was "up and down."

28.      Although Defendant's question was tinged with inappropriate demeaning cultural overtones, Dr. Schmidt soldiered through the interview.

29.     The next day, Defendant employee Philip Vierling called me on my cell phone and said that Dr. Schmidt "spooked" the faculty members and said the faculty did not want her as the primary associate accounting professor because she aspirations to do research and someday be president of the University.  However, Vierling stated that Defendant may be willing to consider her for a teaching position in the College of Business and perhaps in other capacities.  The way in which Vierling explained Defendant's half-committal decision was confusing to Dr. Schmidt.

30.     Defendant UNW thereafter offered Dr. Schmidt a position with University of Northwestern-St. Paul in July 2017.  Shortly thereafter the slights and incident of discrimination proceeded.

31.     On August 1, 2017, while walking across campus with her transgender daughter, Dr. Schmidt met up with Dr. Vierling whom she called to ask about office decorating restrictions and to get office keys.

32.     While walking with Dr. Vierling, he pointedly asked Dr. Schmidt's teen daughter what makes her mother (Dr. Schmidt) angry? Her daughter asked what he meant.  Instead of

restraining himself from pursuing and attributing the stereotype of angry black woman to Dr. Schmidt, he proceeded to attempt to elicit a defense to Dr. Schmidt's anger.

33.     Dr. Schmidt's daughter sagely and astutely informed him that he should refrain from doing things to make her angry or just leave her alone.  Dr. Schmidt believed the question was odd and it was indeed an improper comment.

34.     Throughout Dr. Schmidt's employment with UNW, Vierling and Dr. Erickson made disparaging remarks about her transgender daughter; calling her a faggot and stating that she was going to hell.

35.     On August 16, 2017, Dr. Schmidt spoke with Defendant employee, John Donaldson about co-opening the New Student Orientation event in Riley. He said he had planned out the presentation and would love for Dr. Schmidt to add additional "personality" to the event.  She agreed to do it.

36.     When, however, on August 28, 2017, Dr. (now Professor) Schmidt attended the new student orientation as Program Manager and new Professor, she was denied the opportunity to co-open the event was left with merely being introduced.

37.     Later in the day, Dr. Dave Erickson stopped into Professor Schmidt's office and said he noticed in the faculty meeting a few days before that she had addressed Philip Vierling as "Phil." He said that it would be professional of her to call him Mr. Vierling.

38.     Dr. Schmidt was a little confused because she wondered why Philip Vierling was not relaying this message to her if there was a problem. In fact, Dr. Schmidt heard a few faculty members refer to Mr. Vierling as Phil, but surmised that it was not ok for the black, female Professor to do so.

39.     Accordingly, Professor Schmidt texted Philip Vierling and apologized for calling

him Phil. Thereafter, so as not to ruffle feathers, Dr. Schmidt refrained from calling him Phil. The next day, it was revealed that Dr. Dave Erickson and Dr. James Smith had "caught me" referring to Philip Erickson as "Phil" and reported back to Philip Vierling. Dr. Erickson then told Mr. Vierling he would "handle" me.

40.   On August 29, 2017, another petty harassment incident occurred where Dr. Schmidt;s course materials were being tampered with. For example, her new tax book was taken off her desk and swapped with one from an unrelated year. The new text that was originally on her desk had Dr. Schmidt's name printed on the top of it in permanent marker.

41.   Dr. Schmidt could not understand why this would happen, but didn't suspect a student since they would most likely be more inclined to just take the book and not leave another behind.

42.   Dr. Schmidt was disheartened as it was her first week in her positions and her employment was already being sabotaged.

43.   Dr. Schmidt saw a colleague earlier with a book having the same color but they took off quickly and she didn't accuse them without knowing with certainly.

44.   Dr. Schmidt spoke with administrators at UNW including Philip Vierling and Dr. Janet Sommers when she visited Dr. Schmidt's department about the dilemma.

45.   Dr. Sommers asked Dr. Schmidt to allow them to handle the situation; insisting that Defendant be allowed time to handle the situation and discouraging Dr. Schmidt from addressing the suspected colleague herself, noting that there were cameras outside of the business department and perhaps they could shed some light. Nothing was done to discover the culprit or retrieve the text as it was never recovered.

46.   The very next day, August 30, 2017, Philip Vierling, continuing his harassment,

8

encountered Dr. Schmidt at her classroom to inform her that he had to come visit her Finance class and observe it. When she returned to her office after class, he entered and said "Ro, that was real teaching. You walked around the classroom, used PowerPoints, and lectured." Dr. Schmidt looked puzzled as this is what she had done as a Professor for 10 years.

47.     Dr. Schmidt then asked Philip Vierling if there was a reason why he thought she had assumed (wrongly) that she had done or would do differently. Vierling said he had heard that Dr. Schmidt was relying solely on panels to teach her class.

48.     Shocked at the accusation and Vierling's surprise regarding the error of his prejudgment of Dr. Schmidt's teaching skills, and the fact that Vierling did not reveal the alleged source of the accusation (whom she believed was Vierling), Dr. Schmidt explained that she, in fact, had not yet even had a panel visit yet, but only invited a guest financial expert via skype as it was a Finance class and the students benefited from the expertise.

49.     Dr. Schmidt further explained that the he expert spoke for 30 minutes and the rest of the course she taught herself. Vierling feigned satisfaction by her explanation.

50.     After Dr. Schmidt attended a welcoming ceremony for New Faculty, Philip Vierling, in an effort to sow division against Dr. Schmidt, went to Dr. Schmidt's office and randomly revealed to her that Dr. David Erickson did not like Dr. Schmidt and did not want her on staff.

51.     Philip Vierling, as an agent of UNW, further stated that Dr. Erickson was seeking to teach Finance in the spring of 2018 and since Erickson had seniority, he will get the opportunity. Vierling also informed her about a book through Cengage Company (a company that provides education content and technology to support learning) that Dr. Erickson, according to Vierling, did not want her to know about.

52.     Philip Vierling further stated to Dr. Schmidt that not everyone at UNW was fond of her.

53.     On September 2, 2017, Dr. Schmidt informed Defendant through Janet Sommers, of the issues brewing in her department with Philip Vierling and Dr. David Erickson.   Jane Sommers said she would pray for me.

54.     As a result, Dr. Schmidt's anxiety and distress mounted regarding the efforts to push her out.  But Defendant failed to resolve the discord.

55.     On September 3, 2017, Dr. Schmidt received a text message from Janet Sommers who suggested that Dr. Schmidt take her concerns to Sue Johnson.

56.     On September 12, 2017, Dr. Schmidt also spoke with her faculty mentor Dr. Winslow and expressed her ongoing concerns. Dr. Winslow suggested strongly that she talk to Dr. Janet Sommers and Dr. Sue Johnson about these issues.

57.     Dr. Schmidt assured sue that she had talked to Sommers and was having coffee with Dr. Johnson later that day.

58.     Later on September 12, 2017, Dr. Schmidt Spoke to Dr. Sue Johnson extensively about the harassment, intimidation and racially charged commentary that was going on the first week of being at UNW; specifically asking her to treat the matter discretely and further asked her to please divulge this information inconspicuously because Dr. Schmidt feared retaliation.

59.     Sue Johnson just laughed and   laughed and said that "oh it's just Philip, he is corporate and sometimes says things that he shouldn't." Indeed, instead of addressing the matter, Dr. Johnson said we should "give him grace because he doesn't know academia. "

60.     Dr. Schmidt felt uncomfortable talking to Johnson further about any happenings within her department and especially about Philip Vierling.

10

61.     On September 25, 2017, Dr. Schmidt spoke Tim Rich, UNW's HR Director to get to know him and went to his office for an hour to meet with him.

62.     Rich asked Dr. Schmidt how things were going in her department.  However, she was reluctant to share but did so.

63.     Instead of meeting the issues head on, Defendant's H.R. Director's response was to recommended two books by Cy Wakeman that spoke about coping with a drama-prone environment, etc.  Director Rich additionally sent Dr. Schmidt an article he wrote about the workplace.  Dr. Schmidt prayed that things would improve in the business department.

64.     Later that day, Philip Vierling, in his ongoing harassment of Plaintiff on the basis of race, age and gender, went into Dr. Schmidt's office "let her know" that Dr. Smith and Dr. Erickson did not want Dr. Schmidt at UNW.

65.     Vierling also stated Dr. Schmidt may have 10 years of teaching experience, but that he has 30 years of business experience.

66.     Dr. Schmidt had an expression of "blank stare" on her face because she couldn't believe Vierling was saying these things.

67.     Dr. Schmidt asked him to stop coming to her with divisive information hoping to prevent any further negativity.

68.     On October 3, 2017, Philip Vierling, in continuing his harassment of Dr. Schmidt alleged that two students told him that Dr. Schmidt was being played in her class and that students were telling Dr. Schmidt that they didn't understand the Accounting portion of the book just so they could slow down the Finance course.

69.     Dr. Schmidt later found out (after UNW non-renewed her contract) that Dr. Vierling has been recruiting students to make false statements about Dr. Schmidt.

70.     On October 4, 2017, Dr. Schmidt had a panel of three professionals in Income Tax

Class. During the panel, Philip Vierling demonstrated his disrespect for Dr. Schmidt to all present

by texting on his phone, crossing his legs, and making rude facial expressions.

71.     Dr. Schmidt attempted to re-direct to make sure the students stayed on task and the

panel remained comfortable.

72.     One of Dr. Schmidt's guests, a UNW human resources professional named Kelly,

was in the back of the room and Philip Vierling did not see her at the time. So Kelly witnessed

much of Vierling's antics but had left out 10 minutes prior to the panel presentation ending. After

the panel had concluded, Vierling immediately gathered with other students (Kevin and Micah)

instead of accepting the invitation to meet the mentors.

73.     Dr. Schmidt brought Melissa (one of the panelists) directly to Vierling and  tried to

introduce her.  She stuck her hand out to greet Vierlingi and he didn't extend his hand and said he

had to go to a meeting.

74.     While giving  the panel a tour of the Riley Building, Dr. Schmidt and the panelists

came to an open area of her department and observed Philip Vierling sitting at a table that is almost

in front of his office eating a donut.  She was baffled at Vierling's behavior after rudely rebuffing

Dr. Schmidt's female panelist and alleging that he had a meeting.

75.     After concluding the tour, Dr. Schmidt escorted the panelist, Melissa, to see Kelly

in HR as Kelly desired to let her know the negative experience she had.

76.     After Melissa left, Dr. Schmidt went back to her office. Philip Vierling came into

her office about 5 minutes later and said that he had feedback already about the panel and asked if

she wanted to hear it. Dr. Schmidt told him that she would, but not before he helped her to

understand what just happened. She reiterated everything regarding the panel event alleged herein

above.

77.     Vierling initially lied and said it never occurred.  But when Dr. Schmidt revealed that HR was in the room. Vierling then said, "Oh, I'm sorry."

78.     Thereafter, Vierling proceeded to tell Dr. Schmidt everything he "perceived" that she did wrong.

79.     After launching his laundry-list tirade against Dr. Schmidt, Vierling told her that he would be the one reviewing her courses soon and that he could not renew her contract and half-threateningly laughed on his way out of the room.

80.     Dr. Schmidt later reported the conduct to Dr. Sommers and also spoke to her department mentor about it.

81.     On October 9, 2017, Philip Vierling told Dr. Schmidt that he and Dr. Erickson had dinner the night before and that Dr. Erickson told him that he (Erickson) and Dr. Schmidt may never be friends but that he (Erickson) would try to be cordial to her. Vierling further stated that said he encouraged Erickson to work with Dr. Schmidt and help her in her "first year" of teaching.

82.     After Vierling left her office, Dr. Schmidt called Dr. Erickson at home (as he was on half sabbatical) and conveyed what Vierling had told her.  Dr. Erickson categorically denied ever making or implying any such thing.  Dr. Schmidt asked him if he would be willing to come in and sit in a three-way meeting with she and Vierling.  He agreed.

83.     Dr. Erickson came in and he and Dr. Schmidt went to his office.  Vierling was there too.  Dr. Schmidt reiterated the need for conversations to be forthcoming and for the department to be healthy and the need for the drumming up of a hostile working environment to stop.

84.     Dr. Erickson repeated what he had told Dr. Schmidt on the phone regarding the falsity of Vierling's comments about her and Vierling never confronted or corrected him nor

defended his allegations.

85.     It was evident that Vierling was lying and that employment sabotage and intentional dissension was occurring.

86.     Still, the very next day, on October 10, 2017, Vierling came to Dr. Schmidt's office and randomly discussed his condoning of a UNW employee having sex with a 17 year old girl and his displeasure with having to dismiss the man from the University. He concluded his uncomfortable and disturbing meanderings by throwing in that Dr. Erickson did not like that Dr. Schmidt called him at home and that he did not appreciate being called by her at all.

87.     Later, Dr. Schmidt met with her department mentor to express her extreme concern about the harassment from with Vierling.

88.     On October 11, 2017, Dr. Schmidt attended her second staff meeting in the business department. This time no one looked at her except John Donaldson. Philip talked over her and looked over her on very important matters. Dr. Schmidt noticed that her work environment was getting to be one of racial hostility and feelings of being exiled like excommunication.

89.     On October 14, 2017, Dr. Schmidt and her husband Roger (who is Caucasian) attended, as special guests, a football game. Dr. Schmidt's husband noticed Philip Vierling and suggested that she make it a point to greet Vierling.

90.     Dr. Schmidt approached Vierling and jokingly asked him if he singing the National Anthem for the game. He responded, "You know I have the ability to extend or not extend your contract and I will not be doing it."

91.     Dr. Schmidt walked away extremely dumbfounded and concerned at how a light moment got turned into such a dark and serious one. Dr. Schmidt reported the incident to her mentor.

14

92.     In a further incident of harassment, two days later, on October 16, 2017, Dr. Schmidt's 16-year old son was on campus with her (after going through a bullying experience at school) and Philip Vierling came over to them and told Dr. Schmidt's son "your mom is crazy" and you have that in your genes and will be crazy like her."

93.     On October 28, 2017, during a conversation about a student petition, Philp Vierling shared confidential and protected information regarding Dr. Sommer's son who was either a former student of Philip Vierling or Philip had intimate knowledge about from a private conversation with Dr. Sommers.

94.     Dr. Schmidt let him know that she did not want to be a part of any such conversation and considered the disclosure a violation of the Federal Education Rights and Privacy Act ("FERPA").

95.     Dr. Schmidt contacted Dr. Sommers later on that evening and shared her concerns about the conversation. Dr. Sommers told her the proper protocol was going to Sue Johnson and allow her to handle the situation.

96.     On October 30, 2017, Dr. Schmidt spoke with Sue Johnson about what she heard from Philip Vierling. Dr. Schmidt also expressed her concerns about the TA's that Vierling grandfathered to her. Dr. Schmidt stated that Vierling told her that Maggie had issues with the previous professor she TA'd for. The main concern was not the TA necessarily deleting work but not grading at all even after being given an opportunity reporting the work was done and being paid for it.

97.     Dr. Johnson brushed off the conversation and said that Moodle is a public and free software the college uses and that weirder things have happened. Johnson also said in regard to Philip Vierling speaking about Janet's son to me, that she really didn't think Vierling means any

ill will.  Johnson again said, "You know Philip, he says whatever is in his mind and just have to ignore that part sometimes."

98.     Later that evening, Dr. Schmidt stayed at her office until almost 10:30 p.m. trying to re-grade assignments as two rows of grades mysteriously disappeared including the work the students did.

99.     Earlier, a student by the name of Brian W. came to Dr. Schmidt's office with a tape recorder and pulled out a piece of paper and start asking her very basic questions about accounting and finance. It was odd because earlier that day he was in Dr. Schmidt's class and was flexing a tattoo (though she was not sure if it was permanent or temporary) at her of a swastika.

100.    Dr. Schmidt was very nervous. As soon as he left her office, she emailed him reiterating what she just observed happened. Dr. Schmidt blind copied and copied Dr. Sue Johnson in on this information.

101.    Dr. Schmidt spoke with Dr. Johnson and directly told her how nervous she was about the encounter and the one in Dr. Schmidt's classroom. All Johnson did was say "don't worry. We will monitor it."   However, nothing was ever reported to Dr. Schmidt that timely and appropriate action had ever been taken with regard to these incidents like none had been taken with the other incidents alleged above herein.

102.    On October 31, 2017, Dr. Schmidt informed Philip Vierling about her student's grades disappearing.  Vierling wryly and mischievously  kind of smiled and said "Well, I do have access as Dean to all courses, but you know I wouldn't do something like that."

103.    Vierling then asked Dr. Schmidt of she thought the TA's would do it. She replied that she did not think her TA's would do anything like that.  Dr. Schmidt was devastated by this and the ongoing conduct by Vierling and UNW.

104.    In her entire decade of teaching, Dr. Schmidt never experienced anything like the harassment and indignities she suffered at the hands of UNW and its employees.

105.    Later, Dr. Schmidt's phone at work rang and displayed a 952 exchange on the caller ID. Upon answering, a male voice on the other end said he was "Richard" from her Finance class. Dr. Schmidt didn't have a Richard in her class, so it made no sense. The person said she was a black "bitch" and asked if she really got her degree. Before she could respond the party hung up. Dr, Schmidt reported the incident but nothing was ever done about it.

106.    When Dr. Schmidt came in the following morning, November 1, 2017, she noticed that her office desk and cabinets were opened. Several new pens were taken from boxes and drawers and two books from her shelf were missing. She asked Philip Vierling about getting keys to the cabinets in her office and he told her to ask Ashley Kinsley. Ashley gave her a handful of keys that were left by the previous professor but none of them worked.

107.    Dr. Schmidt also visited Mark's (Technologist for Moodle) office earlier and he looked on the back end of the computer system and saw two unfamiliar places of origin that showed the deletions occurred. Mark said that he was stumped for the first time at UNW and couldn't decipher the origin of the deletions.

108.    Dr. Schmidt felt defeated and deflated the following day, November 2, 2017, wondering if her race or age or gender and any other reason was why she had been retaliated against for letting Dr. Sommers and Dr. Johnson know what Philip Vierling had said and done.

109.    As the toxicity of the work environment grew, Dr. Schmidt was did not trust many staff on the campus. For example, although she was directed to Dr. Johnson for assistance with the matters, Dr, Johnson began spinning the issues as a problem of Dr. Schmidt's making for which she had to address.

110.    In fact, on November 6, 2017, Dr. Schmidt spoke with Dr. Sue Johnson again about how she might handle the situation with Philip Vierling regarding his inappropriate comments about numerous things, grades being erased, the toxic environment in the business department. But Sue Johnson merely said "let me think about it and I'll get back to you." Then she added "in the meantime, let's meet on the 10th and we can talk more." Dr. Johnson said that she would have Philip in the November 10th meeting and that Dr. Schmidt would have the opportunity to express my concerns and that she didn't have to worry about retaliation or anything "because she is [Dr. Schmidt's] and Philip's Supervisor."

111.    On November 8, 2017, Dr. Schmidt attended a business faculty meeting and the same routine of being ignored occurred. She asked specific department matter questions and Vierling displayed disgusted at her presence.

112.    On November 9, 2017, Dr. Schmidt held a TA meeting to establish expectations. She was happy to start fresh with new TA's except one who remained combative and reluctant to listen. The TA also went to Philip Vierling's office (with the door open) and spoke aloud about how her dad knows all about estates and she didn't think Dr. Schmidt knew what she was talking about. The TA was the same one Vierling initially told Dr. Schmidt was the best fit for her and then later said that the TA doesn't get along with females.

113.    On November 10, 2017, Dr. Schmidt appeared at Dr. Johnson's office to discuss her concerns and get to some kind of resolution of how to handle all of these issues.

114.    When Dr. Schmidt walked in, Dr. Johnson said "Ro, we are meeting today to talk about your teaching at UNW." Dr. Schmidt was totally confused because the time was to be used to properly address the concerns discussed above herein and share with her the comments that Dr. Johnson said came from surveys written by students in her Finance class. Dr. Schmidt was taken

18

aback.

115.   After hearing and expressing concerns about the protocol on delivery of the student evaluation surveys—to avoid the risk of engaging in violating proprietary content—Dr. Schmidt asked why students were tasked with transporting the confidential surveys to administration. Dr. Johnson had no answer at that time and stated that she was there to help Dr. Schmidt; admitting that "females have the hardest time on UNW's campus their first year."

116.   Dr. Schmidt discovered later that Philip Vierling initially chose to manually collect end of course surveys (instead of electronically as the ones submitted in the response from UNW) taken by students.

117.   Vierling admitted that the surveys were analyzed, read, and re-typed by himself and an assistant and then given to the appropriate department to log. Dr. Schmidt wrote an email to him inquiring about this method and he chose to not address me with a written response but verbally said "this is just the way things are done at UNW."

118.    In actuality, this method of handling surveys is tainted with impropriety and violations of confidentiality and therefore cannot be considered valid nor ethical input into measuring Dr. Schmidt's teaching abilities.

119.   Two months after Dr. Schmidt's dismissal from UNW, Dr. Schmidt learned of a student who confessed that he and other students were asked by Vierling to submit damaging evaluations against her.

120.   After sitting through her first "advisory day" at UNW on November 15, 2017, in which no colleague responded to her expression of gratitude for assistance, Dr. Schmidt attributed their hostility to the first, female and black professor in employment in the business department at their traditionally and mostly white-staffed University to be in in line with that of Vierling, whose

19

goal was to treat her like she was on a plantation.

121.    That same day, Vierling went into Dr. Schmidt's office and angrily criticize her, spewing that he thought he had hired the right person in her but he now doesn't know.

122.    Dr. Schmidt responded,, "what do you mean?'

123.    Vierling said "aid well, your review is coming up soon and I don't know," and then waved his hands with his keys in it and said bye.

124.    The UNW's toleration of the appalling harassment and disrespect to Dr. Schmidt continued to spill over into the student body and the TAs.

125.    On November 20, 2017, Dr. Schmidt asked one of her TA's to grade a lone student's papers and she gave Dr. Schmidt a defiant answer.  Dr. Schmidt explained why she had made that request for just one student to be graded and there was no response.

126.    On November 21, 2017, Dr. Schmidt wrote the TA an e-mail letting her know that since she had not hear back from her that she (Dr. Schmidt) already graded the assignment.

127.    On November 30, 2017, Dr. Schmidt attended a scheduled review in Dr. Johnson's office and they discussed what Dr. Johnson called "themes."

128.    Dr. Johnson also handed Dr. Schmidt a paper with surveys that were allegedly written by her students. Much of the content was personal rather than focused on my teaching style. Dr. Schmidt couldn't believe this was the same group of students that had sat with her for an entire semester and never complained or mentioned to her directly the type of descriptions written on the paper.

129.    Dr. Schmidt again conveyed her concerns about the culture of the business department, the intimidating racial and harassing experiences with Philip and others. But to her surprise, Dr. Johnson said "Ro, Philip sings your praises and I'm not sure what you think he is

doing but you're wrong."

130.   Dr. Schmidt knew in that moment even trying to be heard and listened to and protected by and at UNW would not happen when voicing her negative experiences.

131.   Even as Dr. Schmidt continued to attempt to work through the continuing harassment, she was consistently rebuffed.

132.   On December 14, 2017, Dr. Schmidt wrote to Dr. Tanya Grosz in an email requesting a meeting about dissension that continues from the business department to her department; about stresses that continue to occur in the business department and how she would handle it as a Dean; and also requesting advice about incidents and issues that continued to occur.

133.   In the meeting, after Dr. Schmidt raised her concerns, Dr. Grosz's response was "you seem really unhappy, why do you stay here?" Dr. Schmidt responded she stayed because she loved the students and teaching and felt that God brought her to UNW to teach, write, and speak. Dr. Grosz just nodded her head. Again, Dr. Schmidt saw that any cry for help at UNW with the hostile work environment and harassment dilemmas she faced did and would continue to fall on deaf ears.

134.   Again, Dr. Schmidt left another UNW management office feeling defeated and isolated on a campus where it appeared no one cared about or would address her issues.

135.   On December 18, 2017, Dr. Schmidt attended a welcome luncheon for new employee Christine Olson. After returning to her office, she called Professor Vern (the only black male part-time professor) and asked him if everything was okay and expressed her sentiments of missing him at the lunch.

136.   Dr. Vern said he wasn't invited. Dr. Schmidt asked are you sure? He said, yes.

137.   Dr. Schmidt noted that it was the oddest thing as the only black male part-time

21

professor is not extended an invite.

138.     Dr. Vern had worked at UNW almost a decade. Yet, adjuncts who just started at UNW were present and invited.

139.     Dr. Schmidt began to realize that all of the negative comments Philip Vierling had made about Professor Vern had deeper meaning.   While Dr. Schmidt doesn't like to see discrimination happening of any kind, she also realized at least two more had happened that day. There was never a welcome lunch for her when she started as the first black female in the department and there was no invite for Dr. Vern as the only black male part-time professor.   Dr/ Schmidt was both saddened and appalled.

140.     On December 20, 2017, Dr. Schmidt had a Christmas party for the adjuncts to which she invited Dr. Grosz, Dr. Sommers, Dr. Johnson, Philip Vierling, Dr. Cureton, some students, and many others to  in order to show appreciation to those in her program. Philip Vierling left early in the day and said he had a meeting with a CEO. Prior to him leaving, Dr. Schmidt asked him if he could sign a card for Professor Pollard.  Vierlinng said he said "no, it's too much to think about."

141.     Dr. Dave Erickson signed the card but asked Dr. Schmidt first if it had anything to do with him being demoted in hours. Dr. Schmidt said "no, it's about him being a great professor and how many students love him."

142.     In December 24, 2017, Dr. Schmidt asked Philip Vierling why he missed the party for the adjuncts. Dr. Vierling said "well, I told Dr. Sue and Dr. Tanya that I would not go because doing so would be contrary to what I've already stated."  Dr. Vierling further stated that " I don't agree that every adjunct, especially Professor Pollard, is a good professor and . . . didn't want to send that message by attending."

143.    Vierling continued by stating that  "I told you that Vern is not polished in Accounting and lacks depth and the students complain that he just tells stories so how could I compliment him on that."  Vierling then asked Dr. Schmidt how long Dr. Vern had taught in my program and for how many courses."  Dr. Schmidt told him she had to check but that he was definitely on the roster for Accounting. To which Vierling replied "interesting."

144.    Vierling then reiterated to Dr. Schmidt that he would make better decisions moving forward including not hiring professors like her; implying either or both (i) black (since Professor Pollard and she are black); and/or (ii) incompetent as he claims that Dr. Erickson says that she was.

145.    Vierling then boasted that he had close to 30 self-directed study students because they would rather do that than take a class with Dr. Schmidt.

146.    Dr. Schmidt replied that she heard Vierling tell a few students in his office not to take her class. Vierling responded with the lie that he didn't say that.

147.    Later that day, Dr. Schmidt received a long email from Sue Johnson stating some of the same things that Philip had just boasted to her.

148.    Dr. Schmidt responded back that and asked for a meeting to talk to her directly about everything going on, including about Philip Vierling encouraging students not to take the course that she was assigned to teach that he was also teaching. Dr. Schmidt copied Vierling  on her response as well.  Dr Johnson agreed to a meeting and set it for January 10, 2018.

149.    On December 22, 2017, about6 minutes before graduation for the students, Dr. Schmidt received a call from Dr. Grosz on which she ripped into Dr. Schmidt about having a party and protocol of her not knowing about having to sign the appreciation certificates given to the adjunct professors. She accused Dr. Schmidt of having CGOAL on the certificate but that was

false. Dr. Schmidt apologized to Grosz and she concluded with "Janet is not happy with you." Dr. Schmidt was not sure why Grosz wanted her to know that about Dr. Janet, but the entire method of communication and tone was disturbing.

150.    Dr. Schmidt was visibly in tears in her office and went to John Donaldson's office for a moment to get his advice as to how to rectify her situation at UNW.

151.    Dr. Schmidt started speaking to Donaldson, but then Vierling came to the door and she had to retreat to her own office.

152.    In early January 2018, Vierling continued his relentless harassment of Dr. Schmidt. As she made it back to her office before the end of the day, Philip Vierling made a snide comment to her, saying (while shaking his head) that he made a mistake hiring her. She had a frown on her face with an expression as if to say "why" and Vierling continued by saying …"I don't know Ro"…we'll see what happens to you soon enough.

153.    So distressed by the ongoing harassment, Dr. Schmidt went home and talked to her husband about the latest incident and called Dr. Winslow but had to leave a message.

154.    Still the attacks and harassment continued into the new year.  On January 9, 2018,Dr. Schmidt's emails were being blocked, and all folders were erased that were saved on the computer. IT said she had to delete emails one by one in order to receive them until they updated her computer. She lost very vital information and other documentation related to the abusive situations and environment at UNW that were documented in her notes.

155.    On January 11, 2018, Vierling falsely accused Dr. Schmidt of misrepresenting her attendance at a tax seminar.  Although Dr. Schmidt readily defended her attendance and offered proof of such, again nothing was done to Vierling and his attacks and harassment continued unabated by UNW.

156.    Later that day, Vierling came into Dr. Schmidt's office and said that he was in route to a donor dinner. He paused momentarily and walked up to the corner of her desk nearest to her and said, "Is this the book you're going to be using for my class?"

157.    Dr. Schmidt responded "yes," and Vierling then began turning the pages slowly at first and then very fast and loudly. Vierling then raised his voice to the top of his lungs and shouted "YOU CANNOT DO THAT" and continued ranting loudly about how Dr. Schmidt did not have the authority to change the book. She was literally terrified. His face was red and he was very, very angry.

158.    Dr. Schmidt froze and her hands were shaking. She scrambled to get her phone but couldn't focus enough to dial any numbers. She just pushed re-dial and ended up calling Dr. Yvonne. Dr. Yvonne was in the tunnel on the way back to her office so the remainder of the conversation that Vierling was saying to Dr. Schmidt was going to her voicemail unbeknownst to her. Dr. Schmidt was not sure how much of the conversation got on the voicemail.

159.    Philip Vierling then antagonistically said, "You said that you're from Florida and you like people to be direct but you're not looking at me." Dr. Schmidt responded "No, I'm looking for HR's number."

160.    Dr. Schmidt held in her tears but her knees were shaking. She remembered that Vierling told her earlier the last year that he was always "packing" so she wasn't sure if he'd actually pull out a gun. A few minutes later, her office phone rang and it was Dr. Yvonne who'd made it back to her office. She asked if Dr. Schmidt was okay and she said no. Dr. Yvonne said she was on her way back to Dr. Schmidt's office. When she looked up, Vierling had fled.

161.    Dr. Schmidt then called her husband and he left work to start on the drive to UNW. She also called Nina Barnes, Vice-President for Student Life, and left a message on her

phone. She then called Dr. Dave Erickson's house and his wife answered and said he wasn't home. Her purpose in calling Dr. Erickson was to get him to give Tim Rich a call immediately. She knew that Dr. Erickson was very close to majority of the Presidents and key faculty members of UNW, so he would have important numbers.

162.    Dr. Schmidt didn't know what to make of the situation and her first thought was to get to safety. She also started to type an email to Vierling to document the happenings of everything and copy in HR.  Dr. Yvonne made it to Dr. Schmidt's office and saw her face and asked what happened. After hearing everything, Dr. Yvonne said to table that email. She also told me not to write to Vierling but to write to Dr. Johnson and let her know that she needed to talk to her immediately.

163.    Dr. Yvonne also offered to go to Dr. Johnson's office with Dr. Schmidt in the morning, told her Vierling's conduct was unacceptable and walked her to her car.

164.    Dr. Schmidt called Dr. Winslow but she didn't answer so she left a message for her to call Dr. Schmidt ASAP.  Dr. Schmidt received a text from Dr. Winslow later in the evening saying that she was at a donors meeting and would call Dr. Schmidt after 9 pm.

165.    Dr. Schmidt reported the incident on UNW's internal system as harassment and made a police report. Dr. Yvonne called three times to make sure that Dr. Schmidt was okay and prayed with her.

166.    Dr .Winslow called and in speaking to her learned that Philip Vierling was at the same donor dinner as Dr. Winslow and had voluntarily come to Dr. Winslow with a different rendition of what happened.

167.    On January 12, 2018, HR contacted Dr. Schmidt by phone and Kelly mentioned that she works from home on Friday. She took a full statement over the phone and assured Dr.

Schmidt that she would call Philip Vierling and tell him that Dr. Schmidt filed a report and that he couldn't come into her office without someone else present.

168.    Kelly also asked Dr. Schmidt if she planned to go to work. Dr. Schmidt told her that she needed to go to her office because she had a syllabus to finish due to, among other things, the incident that happened with Vierlig.

169.    Around 12:30 p.m., Dr. Schmidt heard a loud bang on her wall. She texted her husband and said "Oh my goodness, I think that Philip is here. I didn't think he would be in that early."

170.    Dr. Schmidt recalled that her knees started shaking. She also emailed Kelly in HR and she called Dr. Schmidt and said that she hadn't talked to Vierling yet but would be shortly.

171.    Dr. Schmidt could hear the conversation (his side of it) from her office. After they hung up, he went directly into Dr. Dave Erickson's office and was in there quite a while.

172.    Between January 12, 2018 and January 16, 2018, Dr. Schmidt attempted to get UNW to hire an independent outside investigator instead of UNW doing an internal investigation because it and the incident players were too close to the matter.

173.    On January 17, 2018, Dr. Schmidt called her husband to come to the office and stay with her until she finish working.  He arrived around 5:30 pm and stayed until 9:30 p.m. When they walked outside, her car had a gaping hole in it like a golf club or bat hit it. They were stunned. Dr. Schmidt then called the UNW Public Safety Department, the police, and Dr. Yvonne and Dr. Winslow.

174.    With this new incident of violence and intimidation against Dr. Schmidt, the unaddressed harassment and discrimination at UNW had gotten exponential uglier and violent and put Dr. Schmidt in fear for her life.

175.     Still the discriminatory conduct continued.  Though Dr. Schmidt repeatedly informed UNW management and department heads that she, unlike her white male counterparts, was not receiving her textbooks for her students in a timely fashion, the matter went on unabated.

176.     Furthermore, Dr. Schmidt was subjected to bullying and derogatory remarks from UNW personnel about her transgender son with no action being taken by UNW.

177.     On January 24, 2018, Dr. Schmidt received an email form Tara Adams stating she was retained by UNW to investigate the allegations of harassment and wanted to know my availability to go through the issues at hand.

178.     What Dr. Schmidt did not know was that Ms. Adams was an attorney for the law firm Gray, Plant, Mooty, Mooty & Bennett, P.A., the law firm that UNW hired to represent it for the investigation and subsequent EEOC (Title VII) and MDHR (MN.Stat. 363) allegations and charges.  Neither Defendant UNW nor Tara Adams disclosed this relationship or the explicit conflict of interest to Dr. Schmidt.

179.     Tara Adams, at the time, purported to work for the company trainED which UNW hired to "investigate" Dr. Schmidt's claims.  trainED, however, is merely an assumed name for its owner Gray, Plant, Mooty, Mooty & Bennett, P.A.[1]

180.     As expected, the sham investigation determined that there was insufficient evidence to find that Philip Vierling violated the University's Racial and Ethnic Harassment Policy or the Non-Discrimination Policy.  The report neglected to determine whether sufficient evidence to violate state and/or federal law.

181.     Indeed, the entire time that Dr. Schmidt was pouring her heart out to Tara Adams, whom she believed was seeking justice on her behalf,  the information was being used to benefit

---

[1] Gray Plant et al has since merged with Lathrop Gage to become Lathrop GPM, LLP.

UNW.

182. For example, Dr. Schmidt disclosed that she made a police report about the original car incident. Later she learned that her police report/investigation had been dropped.

183. In fact, Dr. Schmidt learned, after hearing Adams' decision that "nothing" happened, that someone called the police department and implied the matter was being handled at UNW already and to drop the case. The case was dropped and when Dr. Schmidt inquired of the officer about who had contacted him, the officer said he thought she (Adams) was Dr. Schmidt's attorney.

184. And the discriminatory acts, harassment continued throughout the year.

185. In May 2018, after returning to her car (a brand new vehicle) which was parked on campus during a faculty and family picnic, Dr. Schmidt discovered the threat "Leave Nigger" scrawled on her vehicle.

186. Dr. Schmidt immediately felt extreme hurt, shame, aching in her chest, and fear as before. The internal and mental wounds remained and in no way had she been in a condition to feel safe or comfortable at UNW.

187. Dr. Schmidt also learned that from Dr. Lisanne Winslow, her mentor that UNW assigned to her (as UNW says this is the norm for new faculty members no matter how experienced they are) that one of their mutual students confessed to her that there was an attempt to sabotage Dr. Schmidt and a plan to submit disparaging remarks about Dr. Schmidt's teaching. Dr. Winslow stated that a faculty member started the entire campaign to do so and she went into detail about the student's comments.

188. Dr. Winslow further encouraged the male student to write Dr. Schmidt an email about this detail as it would aid in her struggle she was facing with UNW. She stated that this

29

student expressed complete remorse and had planned to tell Dr. Schmidt about this but Dr. Schmidt never head from the student during her employment.

189.    Dr. Schmidt also attempted to vindicate the rights of an older (80+), African-American Professor, Dr. Vern Pollard.  But Vierling and UNW wanted to get rid of Dr. Vern Pollard, both refused to promote him and then demoted him.  Vierling used Dr. Schmidt's defense of Pollard to further harass her.

190.    Dr. Schmidt also defended her daughter's transgender protected class as well as her autistic son's race.

191.    Dr. Erickson and Vierling would consistently and inappropriately confront Dr. Schmidt's young son (to the point of making him cry) and tell him to move from in front of "their doors" while he was sitting in a chair quietly in a public place.  But UNW failed to take any action to stop this violative conduct.

192.    All of these above incidents caused Dr. Schmidt emotional and physical pain and suffering as well as monetary damages and damage to property.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF TITLE VII – DISCRIMINATION ON BASIS OF RACE, AGE, GENDER; RETALIATION

#### (UNIVERSITY OF NORTHWERN-ST PAUL)

193.    Plaintiff repeats and incorporates by reference the foregoing paragraphs as though fully stated herein.

194.    Defendant's discriminatory conduct was based on Plaintiff's race, gender, and age.

195.    Defendant UNW treated white and employees more favorably than Defendant treated Ms. Schmidt, a female person of color, in terms of supervision, dispute resolution, and discipline.  White employees were not falsely accused of teaching incompetence and then repeatedly called into pretextual

30

meetings for the unlawful purpose of badgering and berating them, making false allegations, and feigning corrective and disciplinary actions for the purpose of terminating her.

196.    UNW also frequently ignored intentional race and gender harassment and intimidation and discrimination by White employees, and retaliated against Ms. Schmidt for reporting the illegal conduct of her colleagues.

197.    Defendant created a hostile work environment for Ms. Schmidt, consisting of false accusations, berating and disrespectful communications, hate crimes, and false and misleading attempts to build a case against Plaintiff. The conditions were pervasive and severe, causing Ms. Schmidt to experience physical and mental health symptoms as a result of the unnecessary stress.

198.    UNW retaliated against Ms. Schmidt when she opposed the discriminatory treatment of herself, transgender individuals, an approximately 70+ year old African-American professor, and when she opposed the favoritism afforded white, male colleagues.

199.    When Ms. Schmidt complained to H.R. representatives and upper management that Vierling and Dr. Erickson and other colleagues were harassing her, making false accusations, and treating her unfairly, UNW ignored her complaints, and isolated and retaliated against Ms. Schmidt.

200.    Defendant further engaged in a duplicitous charade investigation; hiring its own lawyers to pretend to act as independent investigators but really hired its own legal representation to attempt to gather damaging evidence to be used against Ms. Schmidt.

201.    UNW conducted a sham "independent" investigation (through its own legal counsel), under the assumed name. trainED, in an effort to create a false paper trail to support its discriminatory conduct. Employment of the "investigator," was a mere pretext for discrimination, and a method to gather information to terminate Ms. Schmidt without revealing to her that the investigator worked for UNW's legal counsel.

202.    Defendant's conduct created a racially and gender intimidating, hostile, and offensive work environment in violation of Title VII.

203.   As a direct and proximate result of Defendants' conduct, Ms. Schmidt has suffered, and continues to suffer, injuries including, but not limited to, increased physical manifestations and other medical issues, loss of employment opportunities, out-of-pocket expenses, humiliation, emotional distress, embarrassment, and anxiety.

## COUNT II

### VIOLATION OF  29 U.S.C. SECTION  623 - AGE DISCRIMINATION

### (UNIVERSITY OF NORTHWESTERN-ST. PAUL)

204.   Plaintiff repeats and incorporates by reference the foregoing paragraphs as though fully stated herein.

205.   Plaintiff repeats and incorporates by reference the foregoing paragraphs as though fully stated herein.

206.   The actions of defendant UNW in discriminating against Plaintiff and then retaliating against her for opposing the discriminatory conduct, all constituted illegal discrimination and interference with Plaintiff's employment rights, right to contract, and employment contract, based on age.

207.   The interference with Plaintiff's employment rights and contract based on age violates 29 U.S.C. Section 623.

208.   As a direct and proximate result of the conduct of defendant UNW, Plaintiff has suffered, and continues to suffer, injuries including, but not limited to lost income, lost promotions/and or career advancement opportunities, out-of-pocket expenses, humiliation, emotional distress, embarrassment, and anxiety.

### COUNT III

### NEGLGENT SUPERVISION

### (UNIVERSITY OF NORTHWESTERN-ST. PAUL)

209.   Plaintiff repeats and incorporates by reference the foregoing paragraphs as though fully stated herein.

210.   Defendant UNW knew or should have known of Defendants' propensity for reckless, discriminatory, harassing and heedless behavior likely to endanger others and cause injury.

211.   The ongoing actions of Defendants Vierling, Erickson, Grosz and Johnson including the alleged actions in engaging in verbally abusive and threatening language with Dr. Schmidt and other actions raised by other colleagues and students against Defendant UNW as well as public protests over gender issues at UNW did or should have put Defendant UNW on notice of its employees' apparent unfitness for interacting with African American women, other people of color and a diverse culture; especially those in its employ.

212.   Defendant UNW should have discovered Defendants Vierling's, Erickson's, Grosz's and Johnson's propensities for discriminatory, abusive, threatening, and violent conduct by reasonable investigation.

213.   Defendant UNW knew or should have known that Defendants Vierling, Erickson, Grosz and Johnson posed a threat of injury to others.

214.   Despite this knowledge, employed Defendants Vierling, Erickson, Grosz and Johnson.

215.   During the course of employment, Defendant UNW became aware or should have become aware of problems with Defendants Vierling, Erickson, Grosz and Johnson that indicated their unfitness for theirs employment position.

216.   Defendant UNW failed to take further action against Defendants Vierling, Erickson, Grosz and Johnson such as properly investigating, discharging, or reassigning Defendants Vierling, Erickson, Grosz and Johnson.

217.   Despite this knowledge, and the demonstrated reckless and/or wrongful behavior

of Defendants Vierling, Erickson, Grosz and Johnson, continued to employ them.

218.    Defendant UNW owed a duty of reasonable care to all citizens, including Plaintiff Schmidt, to avoid employing individuals such as Defendants Vierling, Erickson, Grosz and Johnson who demonstrated reckless and/or wrongful behavior.

219.    Defendant UNW failed to exercise reasonable care in supervising Defendants Vierling, Erickson, Grosz and Johnson.

220.    Defendant UNW knew or should have known that failure to properly supervise Defendants Vierling, Erickson, Grosz and Johnson could or would cause harm to others, including Plaintiff.

221.    Defendant UNW failed to take remedial measures to ensure the safety of others, including other employees of UNW.

222.    Defendant UNW breached its duty of care to Plaintiff by its omissions, actions, and practice of permitting Defendants Vierling, Erickson, Grosz and Johnson to be discriminatory, harass, intimidate and verbally assault others.

223.    As a result of these outrageous negligent actions and omissions, Plaintiff was caused severe harm, including physical injury and other emotional and mental distress, resulting in harm to Plaintiff.

224.    Defendant Philip Vierling threatening assault of Plaintiff and Defendants Vierling, Erickson, Grosz and Johnson other harassing and intimidating conduct took place within the scope of their employment with Defendant UNW.

225.    The source of the attacks were related to the job duties of Defendants Vierling, Erickson, Grosz and Johnson.

226.    Defendants Vierling, Erickson, Grosz and Johnson's attacks, harassment and

34

intimidation against Plaintiff occurred within the work-related limits of time and place, i.e., during business hours of operation on the property of UNW.

227.    Defendant UNW was reasonably on notice of Defendants Vierling, Erickson, Grosz and Johnson's abusive, threatening, and discriminatory propensities.

228.    Wherefore, as a direct and proximate cause of the actions of the Defendants, Plaintiff has suffered damages in an amount in excess of Seventy-Five Thousand dollars ($75,000.00).

## COUNT IV

### VIOLATION OF 42 U.S.C. SECTION 1983
### VIOLATION OF EQUAL PROTECTION CLAUSE

### (VIERLING, ERICKSON, GROSZ, JOHNSON)

229.    Plaintiff repeats and incorporates by reference the foregoing paragraphs as though fully stated herein.

230.    The actions of Defendants, who are all private actors, in discriminating against Plaintiff and then retaliating against her for opposing the discriminatory conduct, all constituted illegal discrimination based on Plaintiff's race, age, gender, and other immutable characteristics.  Defendants' conduct deprived plaintiff of equal protection under the law. Defendants Vierling, Erickson, Grosz and Johnson are sued herein in their individual capacities, and their official capacities as permitted by the law.

231.    The actions of Defendants Vierling, Erickson, Grosz and Johnson in discriminating against Plaintiff because she opposed discriminatory conduct against transgender individuals and senior age colleagues of color violated constituted illegal discrimination and deprived Plaintiff of equal protection under the law.

232.    The actions of Defendants Vierling, Erickson, Grosz and Johnson in discriminating against Plaintiff and then retaliating against her for opposing the discriminatory conduct, all constituted illegal discrimination and interference with Plaintiff's employment rights, right to contract, and

35

employment contract based on Plaintiff's race and gender.

233.   The actions of Defendants Vierling, Erickson, Grosz, and Johnson in discriminating and retaliating against Plaintiff because she opposed discriminatory conduct against senior age colleagues of color and transgender relatives, constituted illegal discrimination and interference with Plaintiff's employment rights, right to contract, and employment contract based on race, age, and gender.

234.   White employees were more favorably treated by defendants Vierling, Erickson, Grosz and Johnson, and were not subjected to harassment, discrimination and termination based on their immutable characteristics.  White employees were also treated more favorably with respect to discipline by Vierling, Erickson, Grosz and Johnson.

235.   The discrimination against Plaintiff based on her race, age, and gender violates 42 U.S.C. Section 1983.

236.   As a direct and proximate result of the conduct of Defendants, Plaintiff has suffered, and continues to suffer, injuries including, but not limited to lost income, lost promotions/and or career advancement opportunities, out-of-pocket expenses, humiliation, emotional distress, embarrassment, and anxiety.

**WHEREFORE**, Plaintiff Rolanda Schmidt requests judgment in her favor and against Defendant University of Northwestern-St. Paul as follows:

1.   An amount in excess of $75,000.00, as and for compensatory damages;

2.   For special damages as yet undetermined, the entirety of damages being still ongoing;

3.   An award of treble damages in favor of Plaintiff and against Defendants pursuant to the Minnesota Human Rights Act, Minn. Stat. Section 363A.071, *et. seq.*

4.   A Court Order requiring Defendants to pay Plaintiff's reasonable attorney fees and costs pursuant to all applicable federal and Minnesota state statutes, including but not limited to 42 U.S.C. § 1988;

5.   Prejudgment interest;

36

6.  Post judgment interest;

7.  After an appropriate motion, hearing, and order of the Court, an award of punitive damages; and

8.  For any and all such other and further relief, including injunctive and/or declaratory relief, and any and all other relief and damages as are just and equitable and/or allowed under federal and state statutes, the premises having been well and duly considered herein.

## JURY TRIAL REQUEST

Plaintiff respectfully requests a trial by jury on all triable issues.

## VERIFICATION

Rolanda Schmidt states under penalty of perjury, that the foregoing facts are true and correct, based on her personal knowledge, with the exception of facts that are stated on information and belief, and statements based on public information.  As to statements based on information and belief, Ms. Schmidt believes them to be true.

Dated:  June 21, 2023                     /s/Rolanda Schmidt
                                          **ROLANDA SCHMIDT**


Dated:   June 21, 2023                     **WARD LAW GROUP**

                                          By:   *Damon L Ward*
                                              Damon L. Ward, ID # 221442
                                          4057 Brunswick Avenue
                                          St. Louis Park, MN 55416
                                          (612) 353-1000 Office
                                          (612) 282-3060 Direct
                                          (866) 759-6030 Fax
                                          dward@wardlawgroup.com

                                          **ATTORNEYS FOR PLAINTIFF**
                                          **ROLANDA SCHMIDT**

**ACKNOWLEDGMENT**

The undersigned attorney hereby acknowledges the provisions of Minn. Stat. 549.211.

Dated: __June 21, 2023_____                    **WARD LAW GROUP**

                                                    By: ___*Damon L Ward*_____

                                                        Damon L. Ward, ID # 221442
                                                    4057 Brunswick Avenue
                                                    St. Louis Park, MN 55416
                                                    (612) 353-1000 Office
                                                    (612) 282-3060 Direct
                                                    (866) 759-6030 Fax
                                                    dward@wardlawgroup.com

                                                    **ATTORNEYS FOR PLAINTIFF**
                                                    **ROLANDA SCHMIDT**

1341091010800034

J#
1200

STATE OF MINNESOTA
DEPARTMENT OF STATE
FILED

JUN 2 3 2023

Steve Simon
Secretary of State