## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

ROLANDA SCHMIDT,

                                                    Civil No. 23-2199 (JRT/JFD)

                        Plaintiff,

v.

UNIVERSITY OF NORTHWESTERN-ST. PAUL,

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

                        Defendant.

Damon L. Ward, **WARD LAW GROUP**, 4057 Brunswick Avenue, St. Louis Park, MN 55416; Samuel Henry, **SAMUEL C. HENRY ATTORNEY AT LAW**, 2274 Salem Road, Conyers, GA 30013, for Plaintiff.

Kathryn M. Nash and Richard C. Landon, **LATHROP GPM LLP**, 80 South Eighth Street, Suite 3100, Minneapolis, MN 55402, for Defendant.

Plaintiff Rolanda Schmidt brings this employment dispute against her former employer, University of Northwestern-St. Paul ("University"), for discrimination and retaliation based on race and gender. Schmidt's remaining claims are for violations of Title VII of the Civil Rights Act of 1964 and state law under a negligent supervision theory. After completing bifurcated discovery on whether the ministerial exception applies, the University moved for summary judgment, arguing that the ministerial exception bars the Court from interfering with this employment dispute.

The Court will grant in part and deny in part the motion for summary judgment. Because the University is a religious institution and Schmidt is a "minister," the ministerial

exception bars court interference with the Title VII claim.  The Court will therefore grant summary judgment in part on the Title VII claim.  Whether the ministerial exception also bars court inference with the negligent supervision claim is less clear, so the Court will deny summary judgment in part on the negligent supervision claim.

## BACKGROUND

### I.    FACTS

Because discovery was bifurcated so that the question of whether the ministerial exception applies would be resolved before full discovery is launched, this background focuses on facts pertaining to the ministerial exception issue.

The University of Northwestern-St. Paul is a private, co-educational Christian university.  (Decl. of Janet Sommers ("Sommers Decl.") ¶ 4, Oct. 7, 2024, Docket No. 42; Decl. of Damon Ward ¶ 12, Ex. 10, Dec. 9, 2024, Docket No. 69.)  Its stated mission is "to provide Christ-centered higher education equipping students to grow intellectually and spiritually, to serve effectively in their professions, and to give God-honoring leadership in the home, church, community, and world."  (Decl. of Richard C. Landon ("Landon Decl.") ¶ 4, Ex. 2 ("Part I") at 1, Oct. 7, 2024, Docket No. 41.)[1]  One of the University's touchstones is the belief that "*all* intellectual inquiry starts from a set of assumptions based on faith." (Sommers Decl. ¶ 12.)   The institution's Philosophy of Education emphasizes this principle, stating that "the study of the Bible is central to our approach to education"

---

[1] The Court cites to the document's original pagination instead of the ECF page numbers.

because the Bible is "the foundation from which all other disciplines emerge and the ultimate judge of all fields of inquiry." (*Id.*)

All applicants who wish to join the University's faculty are required to explain their personal faith, their philosophy of Christian higher education, and their plans to integrate Christianity into their teaching. (Sommers Decl. ¶ 6.) New hires are required to read, acknowledge, and commit to the University's Doctrinal Statement and agree to comply with the obligations identified in Part I of the Faculty Handbook. (*Id.* ¶¶ 7, 8.) The Doctrinal Statement outlines the University's Christian-based beliefs, and Part I of the Faculty Handbook enumerates the faculty's obligation to support the mission of the school and commitment to the University's statement of faith. (Landon Decl. ¶ 17, Ex. 15; Part I at 3.) The Faculty Handbook also states that faculty are expected to be "guided by biblical principles and objectives" and encouraged to join local churches or parachurch organizations. (Part I at 1, 7.) Faculty members who do not adhere to the Doctrinal Statement and its related obligations are subject to disciplinary action, including termination of employment. (*Id.* at 18.)

Regardless of discipline, all faculty members are "identified as ministers of the gospel of Jesus Christ and are tasked to disciple students in growing both intellectually and spiritually." (Sommers Decl. ¶¶ 5, 12.) Faculty are expected to "integrate [their] faith with [their] intellectual, scholarly, and professional work," and to "teach and engage with students both inside and outside the classroom." (Part I at 36; *see also* Sommers Decl.

¶ 9.) In addition, faculty are expected to "do more than communicate the content of their discipline to their students: they should also share their lives as part of the educational process" as active members in the "Body of Christ." (Part I at 37; *see also* Sommers Decl. ¶ 11.) What's more, faculty are expressly evaluated on their ability to integrate their faith into their disciplines. (Sommers Decl. ¶ 9.) In fact, faculty are assessed on their "Christian commitment and modeling [of] an exemplary Christian life." (Part I at 15.) Further, faculty seeking promotion or an extended contract are required to write about their philosophy of Christian higher education and to explain how "Scripture inform[s] the practice of [their] calling as a Christian educator[.]" (Sommers Decl. ¶ 9; *see also* Part I at 23.) Students are also asked to evaluate the integration of Christian thinking into their classes. (Sommers Decl. ¶ 10.)

In June 2017, Schmidt applied for a professor of accounting position at the University. (Landon Decl. ¶ 5, Ex. 3.) The job description emphasized that "all employees act as a minister of the gospel of Jesus Christ by actively partnering with the University to disciple students in growing intellectually and spiritually, and with Northwestern Media to lead people to Christ and nurture believers to mature in their faith." (*Id.* ¶ 10, Ex. 8.) The job qualifications included a "[d]esire to engage in scholarly research including the integration of accounting and Christianity" and the ability to "maintain a personal relationship with Jesus Christ," be "a consistent witness for Jesus Christ," "maintain a kind, Christ-like attitude in dealing with and ministering to people within and outside [the

University]," and "faithfully uphold and embrace the [University's] mission, doctrinal statement, and Declaration of Christian Communit[y]." (*Id.*)

In her application, Schmidt detailed her education, credentials, and prior work experience, which included ten years of teaching as an adjunct professor, eleven years as an ordained minister, and seven years as a non-ordained minister. (Landon Decl. ¶ 5, Ex. 3 at 2–4.) In the "Personal Faith" section of the application, Schmidt explained her current church involvement and wrote, "My relationship with God is the strongest its ever been. I rely on him daily through prayer, Biblical application, and sometimes just 'being still' to guide my thoughts and actions." (*Id.* at 5.) Schmidt acknowledged that she read the University's Doctrinal Statement. (*Id.* at 6.) When asked about her "philosophy of Christian higher education," Schmidt wrote that "[h]aving the opportunity to enhance the [University's mission statement] is an honor and a blessing." (*Id.*) She explained that, if hired,

> I intend to transition the same Biblical truths that I've instilled within my current students (through using scripture to integrate a keen understanding, integrating learning, practice, and faith; using the Bible to identify instructional methods in accounting (i.e. apostles, tax collectors), etc) at the [University] to ensure they develop the values and attitude of Christ.

(*Id.* at 6–7.) Notably, however, in her deposition, Schmidt denies that she was ever told during the application process that she was expected to integrate Christianity into her teaching. (Landon Decl. ¶ 16, Ex. 14 ("Schmidt Dep.") at 31:10–21.)

Schmidt was hired as an Assistant Professor of Business and Program Manager at the University on July 28, 2017. (Landon Decl. ¶¶ 11, 12, 18, 19, Exs. 9, 10, 16, 17; Decl. of Rolanda Schmidt ("Schmidt Decl.") ¶¶ 33, 34, Dec. 9, 2024, Docket No. 68.) On the day she was hired, the University sent Schmidt an email with a welcome letter, a copy of the Philosophy of Education Statement, and the Faculty Handbook. (Decl. of Pearl Ferrin ("Ferrin Decl.") ¶ 6, Oct. 7, 2024, Docket No. 43; Landon Decl. ¶¶ 7, 8, Exs. 5, 6.) It appears these documents were "maintained in the ordinary course of business both during and after [Schmidt's] employment at the University." (Ferrin Decl. ¶ 4.) It also appears the documents have not been altered. (*Id.*) Schmidt signed a statement acknowledging that she read the Faculty Handbook. (Landon Decl. ¶ 21, Ex. 19.)

During her employment, Schmidt was evaluated on her integration of faith into her teaching. (*Id.* ¶ 15, Ex. 13 at 3–4.) During classroom observations, Schmidt began her classes with prayer and a student reading a devotional. (*Id.*; Landon Decl. ¶ 27, Ex. 25 at 2.) She also "ask[ed] students to comment on how class content aligned with their biblical values." (Landon Decl. ¶ 15, Ex. 13 at 4.) In addition, Schmidt's course syllabi provided the University's mission statement. (*Id.* ¶¶ 22–24, Exs. 20–22.) And at least one syllabus also included a statement on "Christian Perspective," noting that the University "is committed to Christian education" and that "this course will operate by Christian principles with Matthew 18:15–20 governing the relationships between faculty and students." (*Id.* ¶ 22, Ex. 20 at 2.) Schmidt's syllabi also provided "Words of Biblical

Wisdom," stating that "Matthew 19:26 reminds us that 'with God, all things are possible.' I humbly encourage each of you to pray daily and ask God to help you get through this course and required homework with diligence." (*Id.* at 3; Landon Decl. ¶ 23, Ex. 21 at 13.)

Schmidt alleges that shortly after she was hired, she experienced discrimination, intimidation, and retaliation by representatives of the University, as well as on-campus hate crime. (Schmidt Decl. ¶¶ 29, 32.) According to Schmidt, former co-workers Philip Vierling, David Erickson, Tanya Grosz, and Sue Johnson subjected her to derogatory comments, racist epithets, and microaggressions regarding herself and her family. (*Id.* ¶¶ 29, 32, 39–41, 47–48, 52–53.) Her car was vandalized on campus, and months later she was subject to a hate crime when she "discovered the threat 'Leave Nigger' scrawled on [her new] vehicle." (*Id.* ¶¶ 54–55.) After Schmidt made multiple attempts to report the misconduct and the University took no action, Schmidt was ultimately terminated in June 2018. (*Id.* ¶¶ 34, 42–46, 49–51.)

## II.    PROCEDURAL HISTORY

After her termination, Schmidt filed a claim with the Equal Employment Opportunity Commission and the Minnesota Department of Human Rights, received a right-to-sue letter, and initiated this action in Minnesota state court on June 21, 2023. (Notice of Removal, Ex. A ("Compl."), July 24, 2023, Docket No. 1-1.) Schmidt brought claims against the University under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and state law under a negligent

supervision theory, as well as claims against Vierling, Erickson, Grosz, and Johnson under

42 U.S.C. § 1983.  (*Id.* ¶¶ 193–236.)

After removing to federal court, the University moved to dismiss the Complaint,

arguing that the Title VII, ADEA, and negligent supervision claims were barred by the

ministerial exception.  (Mot. Dismiss, Aug. 21, 2023, Docket No. 5.)  The Court denied the

motion to dismiss in part because it was premature to determine whether the ministerial

exception applied.  *Schmidt v. Univ. of Nw.-St. Paul*, No. 23-2199, 2024 WL 477166, at *7

(D. Minn. Feb. 7, 2024).  But the Court granted the motion in part to dismiss the ADEA

and § 1983 claims, which Schmidt had voluntarily waived.  *Id.*

Magistrate Judge John F. Docherty bifurcated discovery so the question of whether

the ministerial exception applies would be resolved before full discovery is launched.

(Scheduling Order, Mar. 13, 2024, Docket No. 27.)  After limited discovery on the

ministerial exception, the University moved for summary judgment.  (Mot. Summ. J., Oct.

7, 2024, Docket No. 38.)

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material

fact, and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.    ANALYSIS

The primary issue is whether the ministerial exception bars the Court from interfering with this employment dispute. The University argues that the exception applies, whereas Schmidt contends that the University is not a religious institution and that, in any event, Schmidt is not a "minister" for purposes of the exception.

The "ministerial exception" is an affirmative defense grounded in the religion clauses of the First Amendment that prohibits courts from interfering with employment disputes between religious institutions and their "ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188–89, 195 n.4 (2012). Without such

an exception, courts would be accorded "the power to determine which individuals will minister to the faithful," which would infringe the Free Exercise and Establishment Clauses. *Id.* at 188–89. Though the ministerial exception "does not mean that religious institutions enjoy a general immunity from secular laws, . . . it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). The ministerial exception was first applied to ministers, *Hosanna-Tabor*, 565 U.S. at 191–92, but it has since been applied to teachers entrusted "with the responsibility of educating and forming students in the faith." *Our Lady of Guadalupe*, 591 U.S. at 762.

For the ministerial exception to apply, the University must be a religious institution, and Schmidt must qualify as a minister.

### A.    Religious Institution

At the pleading stage, Schmidt did not dispute whether the University was a religious institution. In fact, she "agree[d] the defendant is a religious institution." (Pl.'s Mem. Opp'n Mot. Dismiss at 6, Oct. 10, 2023, Docket No. 17.) Now, however, Schmidt challenges whether the University qualifies as a religious institution for the ministerial exception to apply.

Schmidt's primary argument is that the University is not a religious institution because it did not exercise ecclesiastical decision-making authority over Schmidt. Schmidt argues that an entity should not qualify as a religious institution for the

ministerial exception unless it employs a form of ecclesiastical governance within its structure—in other words, unless an affiliated church is vested with authority to make decisions within the entity.

The Court finds that the University is a religious institution for the ministerial exception.  Religious educational entities like the University qualify as religious institutions for the ministerial exception.  *See Our Lady of Guadalupe*, 591 U.S. at 757 (applying the exception to the terminations of teachers at Catholic schools); *see also Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 940 (7th Cir. 2022) (applying the ministerial exception to a Catholic high school); *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 333 (4th Cir. 2024) (same).

Nor is there a requirement that a religious institution belong to an established denomination.  While not explicitly providing guidance on whether an entity is a religious institution, *Our Lady of Guadalupe* acknowledged the rich diversity of religious education in this country, emphasizing that "[r]eligious education is vital to many faiths practiced in the United States."  591 U.S. at 754.  The Supreme Court went on to note that "Most of the oldest educational institutions in this country were originally established by or affiliated with churches, and in recent years, non-denominational Christian schools have proliferated with the aim of inculcating Biblical values in their students."  *Id.*  The Supreme Court's acknowledgement of non-denominational Christian schools whose mission is to instill Biblical values within their students indicates that the University qualifies as a

religious institution despite its non-denominational status.  Here, the University is a Christian institution whose stated mission is to provide Christ-centered higher education and support students' growth intellectually and spiritually.  It aims to "expressly set [itself] apart from public schools that [it] believe[s] do not reflect [its] values."  *Id.* at 755.  This is sufficient to qualify as a religious institution.  *See Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) (applying ministerial exception to non-denominational Christian organization).

The University is a religious institution for the ministerial exception.

### B.    Ministerial Role

The parties next dispute whether Schmidt qualifies as a minister for the ministerial exception to apply.

The Supreme Court has declined "to adopt a rigid formula for deciding when an employee qualifies as a minister."  *Hosanna-Tabor*, 565 U.S. at 190.  Instead, there are four factors courts generally consider in the analysis: (1) whether the religious institution held the employee out as a minister, (2) whether the employee's position required a significant degree of religious training, (3) whether the employee held herself out as a minister, and (4) whether the employee's job duties reflected a role in "conveying the Church's message and carrying out its mission."  *Id.* at 191–92.  While all are relevant, none of the four factors are "essential" in every case. *Our Lady of Guadalupe*, 591 U.S. at 750, 752–53.  "What matters, at bottom, is what an employee does."  *Id.* at 753.  Courts

should "take all relevant circumstances into account . . . to determine whether [a] particular position implicated the fundamental purpose of the exception." *Id.* at 758.

In *Hosanna-Tabor*, the Supreme Court applied the ministerial exception to an elementary school teacher from an evangelical Lutheran school. 565 U.S. at 191. Though the teacher taught secular as well as religious subjects, various characteristics qualified her as a minister, including her title as "Minister of Religion, Commissioned"; her extensive religious training and commissioning as a minister; her holding herself out as a minister by, for example, claiming a special housing allowance on her taxes that is only available to ministers; and her job duties that involved teaching religion and participating in religious activities with students. *Id.* at 191–92.

Nearly a decade later, in *Our Lady of Guadalupe*, the Supreme Court applied the ministerial exception to teachers at Catholic schools who did not hold the title of "minister." 591 U.S. at 756–57. Even though the teachers taught secular as well as religious subjects, the fact that they "were entrusted most directly with the responsibility of educating their students in the faith" and "expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith" was noteworthy. *Id.* Though the teachers did not carry titles as "ministers" or have formal religious training, "both their schools expressly saw them as playing a vital part in carrying out the mission of the church[.]" *Id.* at 757. As the Supreme Court explained, "In a country with the religious diversity of the United States, judges cannot be expected to have a

complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Id.* As such, "[a] religious institution's explanation of the role of such employees in the life of the religion in question is important." *Id.*

The Court will evaluate each of the ministerial role factors in turn.

### 1. University's Holding Schmidt Out as a Minister

First, the record indicates the University held Schmidt out as a minister. The University clearly views its faculty members as playing an important role in carrying out its core mission to provide Christian higher education to students. This is most evident in Schmidt's job description and Part I of the Faculty Handbook. Indeed, the job description for Schmidt's position stated that "all employees act as a minister of the gospel of Jesus Christ by actively partnering with the University to disciple students in growing intellectually and spiritually, and with Northwestern Media to lead people to Christ and nurture believers to mature in their faith." (Landon Decl. ¶ 10, Ex. 8.) Part I of the Faculty Handbook further enumerates the expectation that faculty "integrate [their] faith with [their] intellectual, scholarly, and professional work" and be exemplary models as members in the "Body of Christ" for students within and outside the classroom. (Part I at 36–37.)

### 2. Religious Training Requirements

Second, Schmidt's position did not require a significant degree of formal religious training or certifications. While it is true that Schmidt happened to have significant

experience as a minister when she applied to the University, she ultimately took a job teaching secular courses. There is no strong evidence either way that such a position required significant religious training.

### 3.    Schmidt's Holding Herself Out as a Minister

Third, the evidence suggests Schmidt held herself out as a minister. In addition to listing her ministerial background on her application, Schmidt also emphasized her relationship with God and described the opportunity to enhance the University's mission statement as "an honor and a blessing." (Landon Decl. ¶ 5, Ex. 3 at 6.) Schmidt further explained her intent to instill "Biblical truths" within her students by "using scripture to integrate a keen understanding" and "integrating learning, practice, and faith using the Bible to identify instructional methods in accounting." (*Id.* at 6–7.)

### 4.    Schmidt's Role in Conveying Religious Message and Mission

Finally, though less clear, the evidence tends to suggest that Schmidt's job duties reflected a role in "conveying the Church's message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192. On the one hand, Schmidt committed to uphold and support the University's mission and statement of faith when she joined as a faculty member and integrated Christianity into her classes. There is evidence that Schmidt started classes with prayer and student-led readings of devotionals and provided the Christ-centered mission statement and messages on the Christian perspective and Biblical wisdom in her class syllabi. And similar to the teachers in *Our Lady of Guadalupe*, there is evidence suggesting that "[e]ducating and forming students in the [Christian] faith lay

-15-

at the core of the mission of the [University], and [Schmidt's] employment agreements and faculty handbooks specified in no uncertain terms that [she was] expected to help . . . carry out this mission and that [her] work would be evaluated to ensure that [she was] fulfilling that responsibility."  591 U.S. at 756–57.

But on the other hand, Schmidt alleges that she only ever integrated Christianity into her teaching under duress, and that she was only required to implement such integration after she reported the alleged harassment.  Specifically, Schmidt declares that she "never incorporated biblical doctrine into her teaching as it has nothing to do with preparing students to be certified in finance or accounting." (Schmidt Decl. ¶ 13; *see also* Schmidt Dep. at 31:19–21.)  She also claims that her "original syllabi did not have the Defendant's mission statement on it," but that she incorporated biblical messaging on her syllabi only after being "threatened" by an "inebriated, gun toting agent" and after she feared losing her job.  (Schmidt Decl. ¶¶ 15, 18, 23, 26; Schmidt Dep. at 32:10–12.)  In addition, Schmidt claims she "told" the University that she "did not agree to being forced to incorporate biblical things into a marketing class or management class" but was told she would be fired if she refused to integrate prayer into her teachings.  (Schmidt Decl. ¶¶ 19, 20; Schmidt Dep. at 32:15–23.)

After reviewing the record, the Court has found no evidence other than Schmidt's self-serving statements that she reluctantly included the mission statement or biblical messaging in her syllabi, or that she only integrated Christianity into her secular courses

under duress.  As the Fourth Circuit has noted, "[w]hat an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform." *Starkey*, 41 F.4th at 941.  So, the fact that Schmidt carried out the mission of the school as she was entrusted to do—even if unwillingly—does not negate a finding that she was a minister.

To the extent Schmidt argues that the evidence showing that the University expected faculty members to be ministers for their students and to integrate Christianity into their teachings, including her own employment documents, are "fraudulent" or "manufactured," Schmidt presents no evidence to support this argument.  The only concrete example she provides of this alleged fraudulent manufacturing is the difference in dates on the job descriptions provided in Exhibit 8 of the Landon Declaration and Exhibit 4 of the Ward Declaration.  Yet the difference in dates is immaterial if the content of the job description is identical, which it appears to be.  Even viewing all the evidence in Schmidt's favor, no reasonable jury could side with Schmidt's version of events.  *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  Further, to the extent Schmidt asks the Court to weigh in on the sincerity of the University's religious mission, such an inquiry is precisely the sort of intrusion prohibited by the First Amendment's religion clauses.

\*       \*       \*

Everything considered, and though a close call, the Court finds that Schmidt was a minister for the ministerial exception.  Though Schmidt did not have "minister" in her title, and her position did not require significant formal religious training, the record indicates that the University entrusted her directly "with the responsibility of educating [her] students in the faith" and "expected [her] to guide [her] students, by word and deed, toward the goal of living their lives in accordance with the faith."  *Our Lady of Guadalupe*, 591 U.S. at 757.  The University "expressly saw [Schmidt] as playing a vital part in carrying out the mission" of the Christian faith, and the University's "definition and explanation of [her] role[] is important."  *Id.*  While the Eighth Circuit recognizes the ministerial exception, *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.3d 360, 363 (8th Cir. 1991), to the Court's knowledge it has not yet considered whether the ministerial exception applies under these circumstances following *Our Lady of Guadalupe*.  But other circuits have held that secular individuals at religious institutions who are explicitly entrusted with the responsibility of leading students in the faith are ministers for purposes of the ministerial exception.  *See Starkey*, 41 F.4th at 940 (applying ministerial exception to guidance counselor at Catholic school); *Billard*, 101 F.4th at 331–33 (applying ministerial exception to English and drama teacher at Catholic school where "faith infused [the school's] classes – and not only the expressly religious ones"); *see also Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952, 954 (2022) (denying certiorari but suggesting that a

secular teacher who integrates "[f]aith-infused instruction" into secular subjects could be a "minister").   There are similar, persuasive holdings from district courts as well.[2] Schmidt's citations in support of her argument that a secular professor like herself does not qualify as a minister either precede *Our Lady of Guadalupe* or were expressly overturned by that opinion.   *E.g.*, *Biel v. St. James Sch.*, 911 F.3d 603 (9th Cir. 2018) (reversed and remanded by *Our Lady of Guadalupe*); *Fratello v. Archdiocese of New York*, 863 F.3d 190 (2d Cir. 2017).   Despite teaching secular subjects, Schmidt was entrusted with promoting Christianity and integrating the faith into her teaching.   She was also expected to model the Christian faith for her students in and outside the classroom.   Thus, under the current caselaw, the Court finds that Schmidt is a minister for purposes of the ministerial exception.

In light of the Court's finding, however, the Court recognizes the danger that applying the ministerial exception to secular teachers at religious schools like Schmidt poses to such teachers' ability to seek relief from the courts.   The caselaw following *Our*

---

[2] *See Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 196–97 (E.D.N.Y. 2022) (applying ministerial exception to English and social studies teacher at Catholic school); *Zaleuke v. Archdiocese of St. Louis & Assumption Cath. Church – O'Fallon*, No. 4:19-2856 PLC, 2021 WL 5161732, at *6–7 (E.D. Mo. Nov. 5, 2021) (applying ministerial exception to principal at Catholic elementary school); *Conseant v. St. Louis Univ. High Sch.*, No. 4:23-1113, 2024 WL 3551977, at 4 (E.D. Mo. July 25, 2024) (applying ministerial exception where employee's role "involved agreeing to and actively carrying out the school's mission in fostering habits in service to the Greater Glory of God and the Catholic-Jesuit education"); *Saenz v. Omaha Cath. Schs. Consortium*, No. 8:20–225, 2021 WL 7161844, at *4 (D. Neb. Apr. 29, 2021) (applying ministerial exception to science teacher at Catholic school who was responsible for holding class prayers and instilling Catholic values in students).

*Lady of Guadalupe* has applied the ministerial exception quite expansively to secular teachers at religious institutions, which leads the Court to do so here as well.  But the Court is deeply concerned about overbreadth.  If the ministerial exception applies to a mashgiach who supervised kosher food preparation at a Jewish organization, *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 812 (9th Cir. 2024), does it also apply to someone preparing food at a Catholic fish fry during Lent?  With no clear direction on how vastly it can be applied, the ministerial exception is looking like a dangerously broad exception to anti-discrimination laws that is needs a more narrowed interpretation.

But because the University is a religious institution and Schmidt is a minister, the ministerial exception bars the Court from interfering with this employment dispute.  The exception clearly bars the Court's consideration of Schmidt's Title VII discrimination and retaliation claim.  What is less clear, however, is whether the exception also bars the Court's consideration of Schmidt's negligent supervision claim, which the Court will address below.

### C.    Negligent Supervision

The remaining question is whether the ministerial exception also applies to the negligent supervision claim.  The parties did not fully brief this issue.

In *Hosanna-Tabor*, the Supreme Court held that the ministerial exception bars courts from considering employment discrimination suits.  565 U.S. at 194.  But the Supreme Court "express[ed] no view on whether the exception bars other types of suits,

including actions by employees alleging breach of contract or tortious conduct by their religious employers." *Id.*

Courts have applied the ministerial exception to state law claims, including breach of contract and various torts like intentional infliction of emotional distress and defamation. *See Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940, 941–43 (6th Cir. 1992); *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330, 332–33 (4th Cir. 1997); *Lee v. Sixth Mount Zion Baptist Burch of Pittsburgh*, 903 F.3d 113, 123 (3d Cir. 2018). But some circuit courts have also limited the application of the ministerial exception to state law claims "that would impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017); *see also Starkey*, 41 F.4th at 938, 944–45 (holding that the exception applies to state law claims "that implicate ecclesiastical matters," or claims that are "[o]f, relating to, or involving the church, esp[ecially] as an institution"); *Markel*, 124 F.4th at 802, 812 (applying the exception to wage and hour, fraud, and misrepresentation claims that "implicate[d] a tangible employment decision").

The above caselaw emphasizes the importance of keeping courts out of religious institution's internal governance decisions, even if the claims arise under state law. But it is unclear at this juncture whether the negligent supervision claim here would implicate ecclesiastical matters, and thus whether the ministerial exception applies to Schmidt's negligent supervision claim. Because the parties have not fully briefed whether the

ministerial exception applies to the negligent supervision claim, the Court will deny summary judgment without prejudice on the negligent supervision claim.  The Court invites the parties to engage in more limited discovery on this precise issue (if needed), and then, if warranted, bring a summary judgment motion on the negligent supervision claim so the Court may make a more informed decision on the applicability of the ministerial exception to that claim.

## CONCLUSION

The Court will grant summary judgment in part on the Title VII claim because the ministerial exception bars the Court's interference with that claim.  However, the Court will deny summary judgment without prejudice on the negligent supervision claim because it is unclear whether the ministerial exception also bars the Court's inference with that claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 38] is **GRANTED in part** and **DENIED in part** as follows:

1.  The Motion is **GRANTED in part** on the Title VII claim.

-22-

2.    The Motion is **DENIED in part without prejudice** on the negligent

supervision claim.


DATED:  June 5, 2025
at Minneapolis, Minnesota.

                                        JOHN R. TUNHEIM
                                    United States District Judge